Allen S. BRYANT, Petitioner,

v.

Hubert J. SPECKARD, Superintendent, Groveland Correctional Facility, Respondent.

No. 92–CV–0027C.

United States District Court, W.D. New York.

May 30, 1996.

State University of New York at Buffalo, School of Law, Legal Assistance Program (R. Nils Olsen, of counsel), Buffalo, New York, for Petitioner.

Kevin M. Dillon, District Attorney of Erie County (Eleanor T. Kubiniec, Assistant District Attorney, of counsel), Buffalo, New York, for Respondent.

## DECISION AND ORDER

CURTIN, District Judge.

Allen Bryant, who is imprisoned at Groveland Correctional Facility in Sonyea, New York, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On October 25, 1983, Mr. Bryant, an African–American, was convicted, in Erie County Court, of first-degree rape. He challenges his conviction on the grounds that at the time of jury selection, the prosecutor discriminated on the basis of race in exercising a peremptory challenge to excuse the only black prospective juror from service.

In this case, the question of whether the prosecutor's use of a peremptory challenge was race-motivated is a particularly sensitive and difficult one. Mr. Bryant, a black man with no previous criminal record, was alleged to have raped a young white woman. The alleged rape took place at around 3:00 a.m., in the young woman's car, outside a singles

bar in Buffalo, New York. Mr. Bryant and the woman had met at the bar, and had engaged in at least some conversation. Apparently, Mr. Bryant led or allowed the woman to believe that he was a member of the Buffalo Bills football team. There was no dispute that Mr. Bryant and the woman engaged in sexual intercourse after leaving the bar. The central issue at trial was whether the intercourse was consensual, or was forced. There were no witnesses to the alleged rape. After the alleged rape, the young woman simply drove home and went to bed. She did not talk to anyone about the incident until she went to work the following day. The young woman and Mr. Bryant both testified at the trial, and they told markedly different stories. Evidently the young woman had thought she had had intercourse with a member of the Buffalo Bills. At trial, there were questions as to her motive for claiming that she had been raped. Much depended on the jury's evaluation of the credibility of both the young woman and Mr. Bryant. Under the circumstances, it must be acknowledged that Mr. Bryant may have been at a considerable disadvantage in being tried before an all-white jury. An especially careful review of the jury selection process is warranted. Unfortunately, however, adequate reconstruction of the circumstances surrounding the prosecutor's use of a peremptory challenge against the sole prospective black juror is not possible.

It is undisputed that Mr. Bryant has established a prima facie case of discrimination under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In contention is (1) whether a hearing held in Erie County Court on June 14, 1990, was adequate to reconstruct the voir dire proceedings, and (2) whether the evidence presented at that hearing was sufficient to support the presiding judge's conclusion that the prosecutor's use of a peremptory challenge to excuse the sole black prospective juror was not motivated by impermissible considerations of race.

## BACKGROUND

Mr. Bryant was indicted on May 4, 1982, on a charge of Rape in the First Degree. A jury trial was conducted before Erie County Court Judge John A. Dillon in October 1983. Jury selection took place on October 18–19. On the first day, October 18, ten jurors were selected. The only prospective black juror was excused by means of a peremptory challenge by the prosecutor, Assistant District Attorney Richard J. Barnes. No stenographic record was made of the October 18 voir dire proceedings.

At the start of proceedings on October 19, 1983, defense counsel John J. Carney moved for a mistrial:

> At this time, I would like to bring to the Court's attention the fact that yesterday, in jury selection, approximately forty potential voir dire jurors were called to the courtroom; that they were questioned by both Mr. Barnes, the district attorney, and myself; that approximately eighty percent of them were white, suburban housewives; that twenty percent were white males, principally from the suburbs; that there was one black woman on the panel, who was questioned by myself and Mr. Barnes, and who was excused by the prosecution in this case peremptorily, without any cause or reason, and I feel, Your Honor, that this jury panel is not representative; that it does not afford this defendant, particularly in view of the fact that we have a black man who is accused of rape by a white girl, and I question very seriously whether or not under that set of circumstances, he can get a fair trial.
>
> On that basis I move for a mistrial at this time.

Trial Transcript, October 19, 1983, pp. 17–18. The motion was denied pursuant to New York Criminal Procedure Law § 270.10(2), on the grounds that a motion attacking a jury panel must be made in writing and prior to the commencement of jury selection. *Id.* at 19.[1] Following denial of the motion, jury

---

1. New York Criminal Procedure Law § 270.10(2) states, in pertinent part, that "[a] challenge to the panel must be made before the selection of the jury commences, and, if it is not, such challenge is deemed to have been waived. Such challenge must be made in writing setting forth the facts constituting the ground of challenge." Although Mr. Carney objected specifically to Mr. Barnes'

selection was completed, and the trial went ahead with a jury consisting entirely of white men and women. Mr. Bryant was convicted on October 25, 1983, but absconded before the scheduled sentencing on December 2, 1983. He was not sentenced until December 18, 1986, when he received an indeterminate term of four to twelve years' imprisonment.

Mr. Bryant appealed his conviction to the New York State Supreme Court, Appellate Division, Fourth Judicial Department, on the grounds that the prosecutor's peremptory striking of the only black venireperson denied him equal protection of the law. In his appeal brief, he argued (1) that he had set forth a prima facie case of discrimination under *Batson*, and (2) that due to the passage of time between his trial and the hearing of his appeal, the lack of any transcript of the voir dire or any other contemporaneous factual record, and the trial judge's retirement, the usual remedy of remand for a reconstruction hearing was inappropriate. He maintained that his conviction should be reversed, and a new trial granted. Appellate brief, dated November 16, 1989, pp. 10–12.

■ *Batson* applies retroactively to cases not yet final on April 30, 1986, the date it was decided. *Brown v. Kelly*, 973 F.2d 116, 118 (2d Cir.1992) (citing *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987)), *cert. denied*, 506 U.S. 1084, 113 S.Ct. 1060, 122 L.Ed.2d 366 (1993). The Appellate Division was therefore able to consider Mr. Bryant's *Batson* claim. In a memorandum opinion dated March 16, 1990, the Fourth Department found that he had set forth a prima facie case of discrimination under *Batson*, but rejected the argument that a reconstruction hearing was inappropriate, reserving decision and remitting the matter to the Erie County Court for a reconstruction hearing. *People v. Bryant*, 159 A.D.2d 962, 552 N.Y.S.2d 778 (4th Dept. 1990). Mr. Bryant's motion for reargument and reconsideration was denied on May 11, 1990.

On June 14, 1990, a *Batson* reconstruction hearing was conducted in Erie County Court. Because Judge Dillon had retired, the hearing was held before another judge, the Honorable John V. Rogowski. At the start of the proceedings, Mr. Bryant's counsel, Chrysanthe E. Vergos, again noted Mr. Bryant's objection to reconstruction, stating that "[w]e feel that coming seven years after the original jury selection, in view of the fact that the voir dire was never transcribed, and the fact that the trial judge has retired, ... that a remand is inappropriate at this time." H.T. 2.[2]

At the reconstruction hearing, the State called a single witness, Richard J. Barnes, the former Assistant District Attorney who had prosecuted Mr. Bryant. Mr. Barnes remembered the general nature and some of the particular circumstances of the case. H.T. 3, 8–10. He said that the circumstances were "a bit unusual," and there was "some notoriety" to the case because initially, a member of the Buffalo Bills football team had been a suspect. H.T. 9–10. Mr. Barnes recalled that it was his second jury trial as a prosecutor, that it was his first and only trial before Judge Dillon, and that he did not regularly prosecute violent felonies. H.T. 8–9. But beyond that, his recollection of the jury selection was quite limited. He had made notes at the time of the voir dire, and those notes were available prior to and at the time of the reconstruction hearing. *See* Item 34, p. 18 and Exs. A, B, and C; H.T. 17, 21. In addition, at the hearing he was asked to review the trial court clerk's voir dire minutes, in which the names of the challenged, excused, and accepted jurors were listed. *See* Item 34, pp. 18–19; H.T. 14–15, 18, 19. Nevertheless, he was unable to identify by name the black prospective juror he had excused by peremptory challenge (H.T. 4–5); nor could he recall how many peremptory

---

*use of a peremptory challenge* to excuse, "without any cause or reason," the sole black prospective juror, Judge Dillon did not address that issue directly. It is clear, nevertheless, that a timely objection was made to the use of the peremptory challenge. *Cf. McCrory v. Henderson*, 82 F.3d 1243 (2d Cir.1996).

**2.** Citations to the reconstruction hearing transcript are abbreviated as "H.T." followed by the appropriate page number.

challenges he had exercised, or that he had exercised five such challenges against men and one against a woman (H.T. 16); nor could he remember anything about any of the jurors who were finally seated (H.T. 15–16).

Despite this limited recollection of the voir dire as a whole, Mr. Barnes was able to give an account of the circumstances of his peremptory challenge of the sole black potential juror. In response to questioning by Assistant District Attorney Diane M. LaVallee, he testified as follows:

Q. Okay. And can you tell the Court, to the best of your recollection, what happened with this particular female juror?

A. I recall during the questioning of either this juror or perhaps before we even got to this juror, that she requested to approach the bench to speak to Judge Dillon.

Q. And were you present during that conversation with Judge Dillon?

A. Yes, I recall myself and Mr. Carney being asked to come up for a bench conference with this juror.

Q. What was the nature of that conversation?

A. All right, I don't recall at this time specifically what she said, but she did express some concern about being on the jury panel, and had some concern about whether or not she could be fair. I don't recall specifically why, but I generally recollect she was uncomfortable with the case, is the way she put it, and felt she would not—she'd be better suited to be on another jury.

Q. Do you recall the judge's instructions or discussions with her at that point?

A. Again, I don't recall specifically what he said to her, but I know that he encouraged her to try—to answer truthfully whether or not she felt she could be fair, that—words to the effect that they don't like to lightly dismiss a juror, and under all the circumstances, could she try to be fair, and did she feel she could be fair, and I recall her saying something to the effect, well, yeah, she thought she could, she thought she could, after the side bar with the judge.

Q. What were your impressions of this particular juror, as far as seeing her to be fit for this—the selection to the actual jury in this case, after the side bar?

A. Well, I wasn't sure, to be honest with you, what the nature of her problem with the case was. I—I had feelings both ways. I had a feeling, initially, that perhaps was—she was uncomfortable with the black/white situation, it was a white woman victim, Mr. Bryant obviously was a black male. Then I felt maybe she was uncomfortable with what the nature of the charges are, it was a rape. I don't know, we didn't—Judge Dillon didn't pry into exactly what her problems were. She was kind of very apprehensive, and I just, you know, I was not comfortable with her as a juror.

Q. And can you articulate your reason—strike that. Did you in fact challenge her for cause?

A. Yeah, I believe I did.

Q. And was that cause granted?

A. No, I did not challenge her for cause, no, I didn't, excuse me, I did not challenge her for cause.

Q. Okay. Did you challenge her peremptorily?

A. I believe I did, yes.

Q. And what was your reason for peremptorily challenging her?

A. Well, as best I can recall now, I just felt that her apprehension to sit on the case really remained, even though the judge had talked to her. I felt, and no criticism to Judge Dillon, but he had tried to talk her into saying that she wanted to remain on the case, and I just felt that she would not be suited, because I didn't know if she could make a decision because of her apprehension about it. And that's—I was just uncertain about her as a juror because of her apprehension.

H.T. 5–7. Mr. Barnes could not remember whether or not defense counsel had challenged his striking of the black prospective juror at the time of the strike. H.T. 18. Nor could he recall how defense counsel had

framed his objection when challenging the composition of the jury the following day. H.T. 18–19.

Mr. Barnes could recollect almost nothing further about the voir dire, or about the prospective or the seated jurors. He recalled that some of the jurors had said they had children, but he could not remember which ones did so. H.T. 17. After reviewing his notes, he remembered that the spouse of one of the prospective jurors upon whom he had exercised a peremptory challenge was a social worker. *Id.* H.T. 17. When asked if he could remember any other characteristics of the jurors, he stated that he recalled that most of the members of the seated jury were men, and that they were mostly middle aged as opposed to very young, "but that's about, that's about it." *Id.* He could not remember how many prospective jurors were excused by the court. H.T. 13–14. Although he recalled that several had asked to be relieved from service, and that most of the ensuing discussions occurred at the bench, he could not remember the specific reasons given by any of the excused jurors, or whether Judge Dillon had given any reasons for excusing them. H.T. 19–20.

Mr. Bryant offered no witnesses, or any evidence other than the trial court clerk's October 18, 1983, voir dire minutes. The minutes were of little value, for they made no mention of any bench conferences with prospective jurors, and said nothing about Judge Dillon's reasons for excusing any of the jurors from service. At the close of the hearing, Mr. Bryant's counsel moved for a mistrial, arguing that:

> the reasons put forth by the prosecutor are not supported, there is no notation of them anywhere, it's not supported in the clerk's minutes, he can not adequately reconstruct any portion of the voir dire which is essentially the purpose we have come here today. And I—I would have to assume from this that his reasons are simply pretextual.

*Id.* at 22, 25.

On June 22, 1990, Judge Rogowski issued his decision, finding that:

> The sole Black juror in the panel of prospective jurors for defendant's trial sought to be excused because she felt "un-

comfortable" in sitting on the case. The trial court declined to excuse her. Thereafter, the prosecutor exercised a peremptory challenge against her because he believed that even though she had told the court she could be fair, her reservations and apprehensions about serving still remained. I find this explanation to be credible, forthright, reasonable, race-neutral and acceptable. I further find that the prosecutor's use of the peremptory challenge to exclude this prospective Black juror was in no way motivated by impermissible considerations of race.

Decision and Findings of Fact, Rogowski, J., dated June 22, 1990, p. 2.

On February 1, 1991, the Fourth Department affirmed Mr. Bryant's conviction. *People v. Bryant,* 170 A.D.2d 1039, 566 N.Y.S.2d 893 (4th Dept.1991). Leave to appeal to the New York Court of Appeals was denied on May 20, 1991. *People v. Bryant,* 77 N.Y.2d 992, 571 N.Y.S.2d 918, 575 N.E.2d 404 (1991).

On January 14, 1992, Mr. Bryant filed a *pro se* petition for a writ of habeas corpus in this court. Item 1. On March 1, 1993, after assignment of counsel, Item 16, he filed an amended petition. Item 19. Following oral argument on March 11, 1994, the court determined that he had exhausted his state court remedies. Item 30. The merits of his claim have been fully briefed. Items 32, 34.

### DISCUSSION

#### 1. Procedure for Evaluating Prosecutor's Use of Peremptory Challenges Under Batson

In *Batson,* the Supreme Court set forth a three-step process for evaluating claims that a prosecutor has used peremptory challenges to excluded jurors in a manner violating the Equal Protection Clause. *Batson v. Kentucky,* 476 U.S. at 96–98, 106 S.Ct. at 1722–24. The process has been summarized as follows:

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral ex-

planation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Hernandez v. New York,* 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (citations omitted). At the second step of the analysis, " 'the issue is the *facial validity* of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Purkett v. Elem,* —— U.S. ——, ——, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (quoting *Hernandez v. New York,* 500 U.S. at 360, 111 S.Ct. at 1866) (emphasis added); *see also, McCrory v. Henderson,* 82 F.3d 1243, 1246, n. 3 (2d Cir.1996) ("the burden that shifts to the prosecution is only the burden of going forward by providing [a race-neutral] explanation"). At the third step, in which the trial court must decide whether the defendant has carried his burden of proving purposeful discrimination, the *persuasiveness* of the prosecutor's explanation becomes an issue. *Purkett v. Elem,* —— U.S. at ——, 115 S.Ct. at 1771 (citing *Batson v. Kentucky,* 476 U.S. at 98, ·106 S.Ct. at 1723; *Hernandez v. New York,* 500 U.S. at 359, 111 S.Ct. at 1866).

## 2. Standard of Review of State Court Factual Determinations

■ In habeas cases, the factual findings of state courts are presumed to be correct, and, absent some procedural error, may be set aside "only if they are 'not fairly supported by the record.' " *Purkett v. Elem,* —— U.S. at ——, 115 S.Ct. at 1771 (quoting 28 U.S.C. § 2254(d)(8), and citing *Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983)); *see also, Senna v. Patrissi,* 5 F.3d 18, 20 (2d Cir. 1993). If there are findings of fact to which the presumption of correctness applies, a petitioner must prove by "convincing evidence" that the state court's findings were erroneous. *Senna v. Patrissi,* 5 F.3d at 20. A state court's determination of whether a prosecutor's use of a peremptory challenge was motivated by discriminatory intent is one of fact, subject to this deferential standard. *See Purkett v. Elem,* —— U.S. at ——, 115

S.Ct. at 1771–72; *Hernandez v. New York,* 500 U.S. at 364–66, 111 S.Ct. at 1868–69; *Batson v. Kentucky,* 476 U.S. at 98, n. 21, 106 S.Ct. at 1724, n. 21.

■ No presumption of correctness applies under 28 U.S.C. § 2254(d) if the petitioner:

shall establish or it shall otherwise appear, or the respondent shall admit—

. . .

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding . . .

*See Ford v. Wainwright,* 477 U.S. 399, 410–11, 106 S.Ct. 2595, 2602–03, 91 L.Ed.2d 335 (1986); *Wheel v. Robinson,* 34 F.3d 60, 64 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1697, 131 L.Ed.2d 560 (1995).

■ In the context of *Batson* reconstruction hearings, the Second Circuit has recognized that "there are cases where the passage of time may impair a trial court's ability to make a reasoned determination of the prosecutor's state of mind when the jury was selected. Where such demonstrably exists, there must be a new trial." *Brown v. Kelly,* 973 F.2d at 121 (citing *United States v. Alvarado,* 923 F.2d 253, 256 (2d Cir.1991) ("*Alvarado II* ")); *United States v. Alcantar,* 897 F.2d 436, 438–40 (9th Cir.1990). Whether a reconstruction hearing was adequate to protect a defendant's rights under *Batson* is a question of law, reviewable *de novo.* *Cf. United States v. Alcantar,* 897 F.2d at 438.

## 3. Mr. Bryant's Petition

In the present case, there is no dispute that Mr. Bryant has made a prima facie showing of discrimination under *Batson.* At issue is whether Judge Rogowski erred in reaching the conclusion, following the June 14, 1990, reconstruction hearing, that Mr. Barnes' peremptory strike of the only prospective black juror had not been motivated by impermissible considerations of race. Mr. Bryant maintains (1) that the reconstruction hearing was not "full, fair, and adequate" as required by 28 U.S.C. § 2254(d)(6), and Judge Rogowski's finding of no discriminatory intent is therefore not entitled to any presumption of correctness (Item 32, pp. 9–

16); (2) that the hearing failed to provide a meaningful process for determining the adequacy of Mr. Barnes' explanation (*id.* at 17–21); and (3) that Mr. Barnes' proffered explanation was so lacking in support from the record that as a matter of law, Mr. Bryant was entitled to a new trial (*id.* at 21–25).

### a. Mr. Barnes' Explanation for the Peremptory Challenge

I note, first of all, that Mr. Bryant has not at any time argued, either here or in state court, that Mr. Barnes failed to articulate a facially race-neutral explanation for excluding the prospective black juror. This court is, consequently, precluded from reviewing Judge Rogowski's finding that his explanation was indeed facially race-neutral. That is to say, the court may not reexamine the question of whether the respondent has met his burden at the second step of the *Batson* analysis. However, as indicated above, the *persuasiveness* of the prosecutor's explanation is a factor to be considered at the third step of the *Batson* analysis. *Purkett v. Elem,* — U.S. at ——, 115 S.Ct. at 1771. The court must therefore take into account the nature of, and support for, Mr. Barnes' explanation in determining whether the reconstruction hearing afforded Mr. Bryant an adequate opportunity to challenge that explanation—obviously an essential element in carrying his own burden of demonstrating purposeful discrimination.

Mr. Barnes' explanation of the peremptory challenge at issue here was rooted in his subjective impression of the conduct and demeanor of the prospective juror. As Judge Rogowski put it, "he believed that even though she had told the court she could be fair, her reservations and apprehensions about serving still remained." Decision and Findings of Fact, Rogowski, J. p. 2. The Second Circuit has made it clear that a prosecutor's impressions of the conduct and demeanor of a prospective juror can provide a legitimate basis for the exercise of a peremptory challenge. *Brown v. Kelly,* 973 F.2d at 121. "The fact that a prosecutor's explanations in the face of a *Batson* inquiry are founded on these impressions does not make them unacceptable if they are sufficiently specific to provide a basis upon which to evaluate their legitimacy." *Id.* But it is important to note that "because such after-the-fact rationalizations are susceptible to abuse, *a prosecutor's reason for discharge bottomed on demeanor evidence deserves particularly careful scrutiny.*" *Id.* (emphasis added). *See also, United States v. Scott,* 26 F.3d 1458, 1466 (8th Cir.) (voicing concern "over the use of 'subjective judgments' to explain the exercise of peremptory strikes because such judgments are 'particularly susceptible to the kind of abuse prohibited by *Batson.*'" (quoting *United States v. Sherrills,* 929 F.2d 393, 395 (8th Cir.1991))), *cert. denied sub nom. Richard v. United States,* — U.S. ——, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994). Thus, in the instant case, this court must determine whether the reconstruction hearing provided an adequate vehicle for the "particularly careful scrutiny" of Mr. Barnes' subjectively-based explanation.

Before reaching that issue, it is necessary to make one further observation concerning Mr. Barnes' explanation, as follows. On one level, the explanation appears race-neutral, in that it concerned the prospective juror's own expressed apprehension about serving as a juror in Mr. Bryant's case. But on closer inspection, it becomes apparent that it included a race-conscious evaluation of the juror's state of mind, which could be viewed as signalling a discriminatory motive. Specifically, Mr. Barnes noted that the prospective juror had expressed concern about whether or not she could be fair. H.T. 5. Then, when asked about his impressions following the side bar with Judge Dillon, he stated that "I had a feeling, initially, that perhaps was—she was uncomfortable with the black/white situation, it was a white woman victim, Mr. Bryant obviously was a black male." H.T. 6. This explanation suggests that Mr. Barnes believed that the prospective juror's objectivity might be impaired—or, at least, that he suspected that *she* thought that it might be impaired—in part because both she and the defendant were black, and the victim of the alleged rape was white. Such an explanation is not clearly race-neutral on its face. *Cf. Wilkerson v. Texas,* 493 U.S. 924, 924–26, 110 S.Ct. 292, 294, 107 L.Ed.2d 272 (1989) (*cert. denied,* Marshall, J., dissenting); *Batson v.*

*Kentucky,* 476 U.S. at 97, 106 S.Ct. at 1723; *Johnson v. Love,* 40 F.3d 658, 668 (3rd Cir. 1994).

 The Second Circuit has observed that "[a]n explanation for a particular challenge need not necessarily be pigeon-holed as wholly acceptable or wholly unacceptable." *Alvarado II,* 923 F.2d at 256. Where the acceptability of the explanation is doubtful, the *Batson* inquiry is not at an end. *United States v. Alvarado,* 951 F.2d 22, 26 (2d Cir. 1991) ("*Alvarado III*").

> In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. The officer may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one.

*Id. See also, Howard v. Senkowski,* 986 F.2d 24, 30 (2d Cir.1993) (holding that *Batson* challenges are subject to dual-motivation analysis); *Alvarado II,* 923 F.2d at 256.

As discussed above, this court may not reconsider Judge Rogowski's finding, at the second step of the *Batson* analysis, that Mr. Barnes' explanation was indeed race-neutral. But the court cannot avoid considering the suspect element of the explanation in confronting the question of whether or not the reconstruction hearing gave Mr. Bryant an adequate opportunity to carry his burden of proving purposeful discrimination at the third step of the *Batson* inquiry. *Cf. Johnson v. Vasquez,* 3 F.3d 1327, 1329–30 (9th Cir.1993) (assuming, without deciding, that the prosecutor had met his burden of providing a facially race-neutral explanation at step two, but considering, at step three, the "strong indication in the prosecutor's explanation to the trial court that his challenge was, in fact, racially based." *Id.* at 1329),

*cert. denied sub nom. Calderon v. Johnson,* — U.S. ——, 114 S.Ct. 1838, 128 L.Ed.2d 465 (1994).

### b. *Adequacy of the Reconstruction Hearing*

 Ultimately, the determination of whether a peremptory challenge was based upon impermissible considerations of race "depends on an aggregate assessment of all the circumstances." *Alvarado III,* 951 F.2d at 26. In *Hernandez,* the Supreme Court observed that:

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Hernandez v. New York,* 500 U.S. at 365, 111 S.Ct. at 1869 (citations omitted).

The present case is typical only to the extent that the decisive question to be determined was the credibility and persuasiveness of Mr. Barnes' explanation for the peremptory challenge at issue. Beyond that, Judge Rogowski was faced with an unusually difficult problem at the reconstruction hearing. The hearing was held nearly seven years after jury selection and trial. It was certainly difficult for Mr. Barnes to recall the details of jury selection after such a long passage of time.[3] At the time of jury selection *Batson* had not been decided, and so neither Mr. Barnes nor any of the other participants had any reason to take note of any of the details of jury selection that might have as-

---

3. It is true, of course, that Mr. Bryant absconded after his conviction, and was absent for about three years before his sentencing. Part of the nearly seven-year delay between jury selection and the reconstruction hearing must therefore be attributed to his disappearance. However, even after Mr. Bryant's sentencing, more than three and a half years passed before the reconstruction hearing was held. The respondent has not ar-

gued, and there is no indication in the record, that Mr. Bryant took an inordinate amount of time in pursuing his appeal following his sentencing. And there is no reason to think that Mr. Barnes' recollection would have been significantly better had the delay in holding the reconstruction hearing been close to four, rather than almost seven, years.

sisted in later reconstruction of the voir dire under the *Batson* rule.

Judge Rogowski was also presented with an especially difficult problem in that the explanation given by Mr. Barnes at the reconstruction hearing was one based on his subjective impression of the state of mind of the prospective black juror—the kind of explanation that requires "particularly careful scrutiny." *Brown v. Kelly*, 973 F.2d at 121. As discussed above, the explanation contained at least an element of race-conscious evaluation of the prospective juror, making it even more crucial that it should be subject to close examination. But Judge Rogowski had not presided at the voir dire, and so had not had the opportunity to observe the demeanor, or evaluate the state of mind, of either the prospective juror or the prosecutor at the time of the disputed challenge. He was presented with no evidence relevant to discerning the prosecutor's state of mind other than Mr. Barnes' own uncorroborated testimony. And Mr. Barnes' memory of the voir dire proceedings as a whole, and of the details of the events surrounding his peremptory challenge of the sole black prospective juror, was extremely limited, placing in question the reliability of such testimony as he *was* able to give.

■ The Fourth Department did not clearly err, in its decision of March 16, 1990, in remitting Mr. Bryant's case to Erie County Court for a reconstruction hearing. The passage of almost seven years between jury selection and a *Batson* reconstruction hearing does not inevitably mean that sufficient reconstruction cannot be accomplished, or that the defendant will not receive a full, fair, and adequate hearing. *See, e.g., Brown v. Kelly*, 973 F.2d 116 (hearing held six years after voir dire); *McCrory v. Henderson*, 871 F.Supp. 597 (W.D.N.Y.1995) (hearing held ten years after voir dire), *rev'd on other grounds*, 82 F.3d 1243; *but cf. Wilson v. Hoke*, 945 F.2d 1250, 1252 (2d Cir.1991) ("given the lack of a record of the voir dire, the death of the trial judge, and the passage of seven years, further proceedings would not shed reliable light upon the voir dire").[4] Similarly, Judge Rogowski did not err in proceeding with the hearing, over the objections of Mr. Bryant's counsel. He acted at the direction of the Fourth Department, and he could not know, at the start of the proceeding, whether or not sufficient evidence would be presented for him to be able to adequately reconstruct the voir dire and make a reliable determination of why Mr. Barnes used a peremptory strike to excuse the only prospective black juror.

I find, however, that Judge Rogowski *did* err when, on the basis of Mr. Barnes' very limited and equivocal testimony, and without the benefit of any other testimony or documentary evidence shedding light on Mr. Barnes' exercise of any of his peremptory challenges, he reached a definitive conclusion on the issue of discriminatory motive. There was simply not enough solid evidence in the record for the judge to reconstruct the voir dire sufficiently and make a fair evaluation of the issue of discriminatory intent, based on an "aggregate assessment of all the circumstances." *Alvarado III*, 951 F.2d at 26. I am convinced that this is a case "where the passage of time ... [so] impair[ed the] trial court's ability to make a reasoned determination of the prosecutor's state of mind" that a new trial was required. *Brown v. Kelly*, 973 F.2d at 121; *Cf. United States v. Alcantar*, 897 F.2d at 438–40 (finding a reconstruction hearing to have been inadequate, and remanding for a new trial, when no evidence

---

**4.** *Compare, also, Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), in which the Supreme Court held that the *Batson* rule was inapplicable on federal habeas corpus review in cases in which the petitioner's conviction became final before the *Batson* decision was announced, observing:

 Retroactive application would require trial courts to hold hearings, often years after the conviction became final, to determine whether the defendant's proof concerning the prosecutor's exercise of challenges established a prima facie case of discrimination. Where a defendant made out a prima facie case, the court then would be required to ask the prosecutor to explain his reasons for the challenges, *a task that would be impossible in virtually every case* since the prosecutor, relying on [*Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)], would have had no reason to think such an explanation would someday be necessary.

 *Id.* at 260, 106 S.Ct. at 2881 (emphasis added).

was presented at the hearing, and the trial judge stated that although he remembered making a determination at the time of jury selection that the peremptory challenges at issue were race-neutral, he could not remember the specific jurors excluded).

In reaching this determination, I find, in summary, the following factors to be significant:

(1) The explanation given by Mr. Barnes for his use of a peremptory challenge to excuse the sole prospective black juror was entirely subjective, based upon his evaluation of the prospective juror's alleged apprehension about serving as a juror on the case. The explanation contained an element of race-conscious evaluation of the juror. Particularly careful scrutiny of the explanation was therefore essential.

(2) Judge Rogowski had not presided at the voir dire, and so he was unable to base his assessment of Mr. Barnes' state of mind on any personal observation of the demeanor of the prosecutor, or of the struck juror, at the time the peremptory challenge was exercised.

(3) Mr. Barnes' recollection of the circumstances of his peremptory challenge of the sole black prospective juror was far from complete. He could not recall what reason she had given for her alleged concern about serving as a juror, nor, with any specificity, what Judge Dillon had said to her to encourage her to serve. As a result, Mr. Bryant's counsel had no real opportunity, at the reconstruction hearing, to obtain any useful information from Mr. Barnes concerning the extent to which his subjective assessment of the suitability of the juror was based on her actual or suspected discomfort with the race of the defendant and the alleged victim.

(4) Mr. Barnes' recollection of the voir dire proceedings was so limited that Mr. Bryant's counsel could obtain almost no information from him (i) about the characteristics of other prospective jurors or those who were ultimately seated on the jury, (ii) about his use of peremptory strikes to excuse other prospective jurors, or (iii) about any reasons that Judge Dillon may have given for excusing some of the prospective jurors, but not the only possible black juror, from service. As a result, there was no basis for making any comparison between Mr. Barnes' subjective assessment of the suitability of the prospective black juror and his corresponding evaluation of any other prospective or seated juror.

(5) The trial court clerk's voir dire minutes, entered into evidence at the reconstruction hearing, contained no reference to any bench conferences with prospective jurors, and contained no information about Judge Dillon's reasons either for excusing certain jurors or for encouraging the prospective black juror to serve.

(6) No other evidence was presented at the reconstruction hearing.[5]

(7) Finally, Judge Rogowski's June 22, 1990, decision contained virtually no analysis of the evidence presented to him, and no more than a conclusory finding that Mr. Barnes' peremptory challenge was not motivated by considerations of race. Despite the objections raised by Mr. Bryant's counsel to the lack of the adequacy of the reconstruction hearing, Judge Rogowski failed to mention the paucity of the evidence available to him. He found, in conclusory fashion, that Mr. Barnes' explanation had been facially race-neutral, without remarking on the underlying suggestion of racially-tinged

---

5. The court cannot help wondering why nobody other than Mr. Barnes was called as a witness at the reconstruction hearing, either by the Assistant District Attorney or by Mr. Bryant's counsel. The court will take judicial notice of the fact that both Judge Dillon and Mr. Bryant's trial counsel, Mr. Carney, were in Buffalo and presumably available to testify at the time of the reconstruction hearing. Why neither was called, by either side, is a mystery. There is nothing in the record, however, to establish whether they, or any other witness—the sole prospective black juror, for example—could recall enough to be able to provide any useful testimony. The question was not addressed by Judge Rogowski, and has not been raised here by either party. Under the circumstances, the court can presume nothing from the failure of both sides to obtain additional testimony.

assumptions concerning the prospective juror's reason for wishing to be excused from service. And he failed to explain why he was persuaded by Mr. Barnes' explanation in the face of (i) Mr. Bryant's established prima facie case, (ii) the lack of evidence corroborating Mr. Barnes' explanation, and (iii) the clear showing that Mr. Barnes' memory of the voir dire was, at best, extremely limited.

When considered as a whole, these factors compel the conclusion that Mr. Bryant did not receive a full, fair, and adequate hearing on his *Batson* claim in state court. Judge Rogowski's finding that Mr. Barnes' peremptory challenge of the only prospective black juror was not motivated by considerations of race is therefore not entitled to a presumption of correctness under 22 U.S.C. § 2254(d)(6). Because adequate reconstruction of the voir dire was not accomplished, Judge Rogowski erred in reaching any conclusion as to Mr. Barnes' state of mind at the time of the peremptory challenge.

### *CONCLUSION*

For the reasons given above, petitioner Allen Bryant has succeeded in demonstrating that he did not receive a full, fair, and adequate hearing of his *Batson* claim in state court. The passage of time has made reconstruction of Mr. Bryant's voir dire impossible. Accordingly, a writ must be granted, and Mr. Bryant given a new trial. *Brown v. Kelly,* 973 F.2d at 121; *United States v. Alcantar,* 897 F.2d at 438. If the passage of time has rendered a new trial impossible, then Mr. Bryant must be released from confinement.

The court will meet with counsel for the petitioner and the respondent on June 18, 1996, at 3:00 p.m. The Clerk is directed to stay the entry of judgment until after the June 18 meeting.

So ordered.